**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
THIAN ANDERSON,                              :

                    Plaintiff,         :

                             :              **OPINION AND ORDER**

        -against-                   :              07-CV-4969

                             :

MICHAEL J. ASTRUE,                 :
Commissioner of Social Security,      :

                             :

                    Defendant.     :
---------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

        Plaintiff Thian Anderson filed an application for disability insurance benefits ("DIB") under the Social Security Act ("the Act") on July 1, 2003, alleging disability resulting from depression beginning June 26, 2003. Plaintiff's application was denied initially and on reconsideration. Plaintiff testified at a hearing held before an Administrative Law Judge ("ALJ") on June 22, 2005.[1] By decision dated August 19, 2005, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. On September 20, 2007, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. Plaintiff filed this action seeking judicial review of the denial of benefits, pursuant to 42 U.S.C. § 405(g). The Commissioner now moves to reverse and remand the decision for further administrative proceedings pursuant to 42 U.S.C. § 405(g), because the "ALJ's decision contains certain inconsistencies, ambiguities, and legal error." (Def.'s Mem. Supp. Mot. for Remand at 12.) Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision and remand solely for the calculation of benefits. (Pl.'s Mem. Opp. and Cross-Mot. for Reversal.) For the reasons set forth more fully below, the Commissioner's motion is granted and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

---

[1] Plaintiff's initial hearing on May 25, 2005, was adjourned so that she could seek the assistance of a lawyer. (R. 907-08.)

## BACKGROUND

### A. Non-medical and Testimonial Evidence

Plaintiff, born in 1975, earned an undergraduate degree and completed one year of a master's degree program in social work. (R. 39, 66, 775.) She has one child, who was eleven years old at the time of the hearing. (R. 885.) Plaintiff lives with her child and cooks, cleans, and shops. (R. 886, 897.) Plaintiff does not socialize with friends often because of her concern about spending money and because she does not have the "drive to want to go out." (R. 897.) Plaintiff has a driver's license, but does not own or drive a car. (R. 899.) She has suffered from various mental illnesses since 1992, resulting in both inpatient and outpatient psychiatric treatment. (R. 671, 889-93.) Plaintiff filed for Supplemental Security Income benefits in 1999 and was found eligible. (R. 43, 827.) She became insured for Title II benefits on April 1, 2003. (R. 43.)

Since October 1995, plaintiff performed a number of different jobs. First, from October 1995 to January 1998, plaintiff worked as a secretary. (R. 61.) Next, plaintiff worked as a cashier from June 1998 to September 1998. (R. 60.) Between June 1999 and August 1999, plaintiff worked as a counselor at a YMCA day camp. (R. 61.) Then, from September 1999 to January 2000, plaintiff worked as a counselor at Heart Share Human Services. (R. 60-61, 71.) From February 2000 to August 2000, plaintiff worked as a part time counselor at Columbia University. (R. 61.) Then, from March 2001 to July 2002, plaintiff worked as a youth development counselor where she supervised girls living in a diagnostic center. (R. 61, 887-88.) Finally, plaintiff worked as a caseworker for the New York City Administration for Children's Services ("ACS") from August 2001 to June 2003. (R. 819, 886.)

In March 2003, plaintiff's psychotherapist, Ashley Warner, wrote to ACS stating, "Any

accommodation that can be made to reduce stress in the workplace and increase support would bolster Ms. Anderson's recovery and decrease the likelihood of further decompensation and/or need for hospitalization." (R. 124.) Plaintiff requested reassignment from the 7:00 A.M. to 3:00 P.M. shift to the 11:00 P.M. to 7:00 A.M. shift, which she thought would be less stressful. (R. 60.) ACS was unable to accommodate her. (*Id*.) In June 2003, plaintiff quit her job with ACS because working with aggressive teenagers was too stressful. (R. 900.) On February 8, 2005, the New York State Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") notified plaintiff of her eligibility to receive vocational rehabilitation services due to her "disability which affect[ed] [her] ability to work and because [she] would need help to get or keep a job." (R. 877.)

During plaintiff's hearing, she testified regarding her enrollment in a program at netWORK Plus, a vocational training and recovery program for mental heath clients. (R. 769, 894.) Plaintiff testified that she was interning as a receptionist at netWORK Plus to see if she could cope with working again. (R. 894-96.) Although plaintiff only worked at the internship for three days prior to her hearing before the ALJ, she said that the experience had been "okay." (R. 896-97.) Cecelia Hoskins, a netWORK Plus employment specialist, stated that plaintiff's focus in the program changed from searching for employment to treating her mental illness because plaintiff was "extremely depressed and, as a result, was almost completely nonfunctional." (R. 769.) Ms. Hoskins also stated that, in her opinion, plaintiff "is incapable of performing any substantial gainful employment" and that plaintiff's "expectation of holding a steady job are [sic] unrealistic and any new employment will probably lead to another episode of decompensation." (769-70.) Regarding plaintiff's internship, Ms. Hoskins stated that the experience would last a maximum of two weeks

and that it is a sheltered, non-competitive work environment that will allow plaintiff to apply lessons she learned from the program. (R. 770.)

Plaintiff estimated that she could walk five or six blocks, stand for less than an hour, and sit for six or seven hours. (R. 898.) She can also bend, pick up items, reach forward, lift and carry items weighing five pounds or less, push or pull a shopping cart, make fists, and manipulate her fingers. (R. 898-99.) Plaintiff also testified that the medications prescribed for her depression have the physical side effects of dry mouth and weight gain. (R. 895-96.)

In a disability report dated July 3, 2003, plaintiff stated that depression limits her ability to work because she sometimes has difficulty concentrating and organizing her thoughts and she feels overwhelmed. (R. 59.) During the hearing, plaintiff testified that, when she gets sick, she is afraid of her surroundings and the people she knows, has difficulty concentrating and dealing with daily tasks such as getting up, taking a shower, cleaning or cooking, and her sleep becomes restless. (R. 899-900.)

In September 2005, after the ALJ denied plaintiff benefits but before the Appeals Council denied plaintiff's request for review, plaintiff decided to continue her graduate studies in social work and enrolled full time at Long Island University ("LIU") through VESID. (R. 850-51.) Plaintiff provided the Appeals Council with a letter from Ms. Hoskins regarding her continued studies on November 17, 2005. (R. 875-76.) Ms. Hoskins stated that two months after enrolling at LIU, plaintiff was "overwhelmed and falling apart from the stresses of her school internship and her course load," and that plaintiff had difficulty interacting with her internship supervisor and another student intern. (R. 876.) Ms. Hoskins further stated that plaintiff "has had a pattern of undertaking more than her limitations allow, and then becoming overwhelmed and decompensated" and that she

"is unable to perform competitive employment despite her strong desire to do so." (*Id.*)

## B. Psychiatric Evidence

Plaintiff was first admitted to SUNY Downstate Medical Center ("SUNY") from December 1992 to February 1993 for disorganization with religious preoccupations, hallucinations, and overt delusions. (R. 105.) Doctors diagnosed her with major depression with psychotic features. (R. 110.) From May 22, 1998 to June 5, 1998, she was admitted to SUNY for depressed mood with occasional crying and selectively mute behavior. (R. 105.) Doctors diagnosed plaintiff with schizophrenia (disorganized type) at that time. (R. 105, 111.) Plaintiff's discharge papers noted that, prior to hospitalization, plaintiff had not been compliant with medication and treatment. (R. 111.) From November 6, 1998 to November 16, 1998 plaintiff was again admitted to SUNY for depressed mood, poor appetite, poor sleep, and inability to attend daily tasks and discharged with a diagnosis of major depressive disorder with psychotic features. (R. 105, 112-13.) At the time of her discharge, plaintiff was pleasant and cooperative and her insight and judgment were fair. (R. 113.) After feeling depressed again and cutting her wrist with a razor, plaintiff was readmitted to SUNY from December 6, 1998 to December 31, 1998. (*Id.*) Upon discharge, the primary therapist and attending psychiatrist at SUNY diagnosed plaintiff with schizoaffective disorder (depressed type) and dependant personality disorder, with a Global Assessment Functioning ("GAF") score of 40 on admission and 65 on discharge.[2] (R. 106.) Plaintiff's insight and judgment was fair and her mood was neutral. (*Id.*)

Plaintiff was admitted to SUNY again from August 12, 2003 to September 11, 2003. (R.

---

2 "A GAF score between 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF score between 61-70 indicates mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships." (Def.'s Mem. Supp. of Mot. for Remand at 5.)

301.)  During this visit, plaintiff experienced feelings of depression and vague suicidal ideation after learning that her graduate school studies had been postponed.  (*Id.*)  Plaintiff responded gradually to medication and her thought process became more goal-directed and logical.  (*Id.*)  Plaintiff agreed to be compliant with medications and participate in an outpatient treatment plan.  (R. 302.)  Her diagnosis upon discharge was major depressive disorder with psychotic features and a GAF score of 55. [3]  (*Id.*)

Later that month, plaintiff was again hospitalized at SUNY from September 25, 2003 to October 28, 2003 with complaints of fearing that people would hurt her and hearing harmful voices.  (R. 303.)  Upon admission, doctors diagnosed plaintiff with major depressive disorder with psychotic features.  (R. 304.)  Plaintiff was given medication and, after further observation, doctors changed her diagnosis to schizophrenia (paranoid type).  (R. 304-05.)  Prior to her discharge, plaintiff no longer experienced paranoid thoughts or anxiety.  (R. 305.)  Plaintiff's discharge diagnosis was schizophrenia (paranoid type) and a GAF score of 70. [4]  (*Id.*)  Her insight and judgment were excellent.  (*Id.*)

Upon recommendation by the Director of Psychiatry at Brooklyn Psychiatric Center, Dr. Michael Trapido, plaintiff was admitted as an inpatient at Long Island College Hospital ("LICH") from September 3, 2004 to September 14, 2004.  (R. 203, 215, 585.)  In a letter to LICH on September 3, 2004, Dr. Trapido stated that plaintiff needed hospital admission because of

---

3 "A GAF score between 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning."  (Def.'s Mem. Supp. of Mot. for Remand at 7.)

4 A GAF score between 61-70 indicates mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships."  (Def.'s Mem. Supp. of Mot. for Remand at 5.)

"profound depression with significant suicide potential." (R. 585.) Dr. Trapido diagnosed plaintiff with recurrent major depression. (*Id.*) While at LICH, plaintiff received medication management and attended group psychotherapy. (R. 215.) A LICH attending physician discharged plaintiff with a diagnosis of severe, recurrent major depressive disorder with psychosis. (R. 258.) Upon discharge, plaintiff participated in a LICH Partial Hospitalization Program for six weeks. (R. 421-23.)

### C. Reports from Physicians and Social Workers Submitted to the ALJ

Dr. Trapido treated plaintiff at Brooklyn Psychiatric Center from July 2, 1998 to January 2, 2002. (R. 586-621.) On April 2, 2001, Dr. Trapido noted in a treatment plan review that plaintiff's symptoms were in remission due to medication. (R. 619.) Plaintiff returned to Brooklyn Psychiatric Centers from October 2003 to June 2005 and was treated by Evan Kevelson, Licensed Master Social Worker. (R. 739, 749.) Upon admission, plaintiff's GAF score was 61-70. (R. 762.) In a psycho-social update on March 15, 2005, Mr. Kevelson wrote that plaintiff continues to suffer from a low-grade depression and is currently stabilized on medication. (R. 749.) Mr. Kevelson diagnosed plaintiff with recurrent major depressive episode and schizophrenia (paranoid type) in remission with a GAF score of 65. (R. 749.) On May 17, 2005, Mr. Kevelson diagnosed plaintiff with schizophrenia (paranoid type) in remission and recurrent major depressive disorder and a GAF score of 60-65. (R. 706.) At that time, plaintiff also experienced mild anxiety and depression. (*Id.*)

Plaintiff was treated by Ashley Warner, a Certified Social Worker in private practice, with psychotherapy on a weekly basis from July 2, 2002 to December 11, 2002 and from March 25, 2003 to June 17, 2003. (R. 117-19.) Ms. Warner completed a treatment history report on August 18, 2003, diagnosing plaintiff with recurrent, severe major depressive disorder with psychotic features

and dysthymic disorder. (R. 117-23.) In the report, Ms. Warner stated that plaintiff's symptoms as of July 17, 2003 were subjective-depressed mood, anhedonia, hypersomnia, loss of energy, excessive and inappropriate feelings of worthlessness, diminished ability to concentrate, low self-esteem, and feelings of hopelessness. (R. 117.) Plaintiff experienced difficulty concentrating when under stress or feeling overwhelmed and sustaining an ordinary workload and reasonable pace. (R. 120-21.) In a work setting, plaintiff had difficulty asserting herself, low self esteem, and, as depression increased, had difficulty maintaining duties due to poor concentration and excessive fatigue. (*Id.*)

Dr. Andrew Chen, a psychiatrist at SUNY, completed a medical report dated September 10, 2003. (R. 127-33.) Dr. Chen diagnosed plaintiff with major depressive disorder with psychotic features and a GAF score of 30.[5] (R. 128.) Dr. Chen noted that plaintiff might not be able to concentrate for a long time under stress or anxiety and that plaintiff had problems with her supervisor at her last job, where she felt mistreated. (R. 129-32.) Dr. Chen further noted that plaintiff had no limitation in social interaction at work or adapting to changes in the work setting. (R. 131-32.)

Dr. Freeman, plaintiff's treating psychiatrist, began treating plaintiff on a monthly basis in November 2003. (R. 860.) At the time of the hearing, plaintiff testified that she had not seen Dr. Freeman in four or five months. (R. 894.) On May 13, 2005, Dr. Freeman responded to the Commissioner's request for medical evidence and completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" report. (R. 170-72.) According to the report,

_____

5 "A GAF score between 30-21 [sic] reflects behavior that is consistently influenced by delusions or hallucinations or serious impairment in communication or judgment; or inability to function in almost all areas." (Def.'s Mem. Supp. of Mot. for Remand at 8.)

plaintiff's ability to understand, remember, and carry out instructions was not affected by plaintiff's impairment. (*Id.*) Plaintiff's ability to respond appropriately to supervision, co-workers, work pressures, and changes in a routine work setting was moderately affected by her impairment. (R. 171.) Dr. Freeman noted that depressive features still impact plaintiff's functioning and that plaintiff cannot manage benefits in her own interest. (R. 171-72.)

### D. Consultative Examination

At request of the Commissioner, Dr. Herbert Meadow, a psychiatrist, examined plaintiff on August 2, 2003. (R. 114.) According to his report, plaintiff was casually dressed, neatly groomed, and did not exhibit any psychomotor pathology. (*Id.*) Her speech was coherent and goal directed. (*Id.*) Plaintiff did not demonstrate loosening of associations, circumstantial or tangential thinking, auditory or visual delusions, or paranoid ideation. (*Id.*) Plaintiff's mood was depressed and affect was appropriate. Her intelligence level was average and her insight and judgment were unimpaired. (*Id.*) Dr. Meadow concluded that while plaintiff does have a psychiatric disorder, she would be able to function in a low-pressure work setting. (*Id.*)

### E. State Agency Review

Dr. James Kessel, a physician employed by the New York State Office of Temporary and Disability Assistance, reviewed plaintiff's medical records and reported his findings in a "Mental Residual Functional Capacity Assessment" report on September 18, 2003. (R. 152.) Dr. Kessel concluded that plaintiff had shown significant improvement while hospitalized and that she would be fully functional by June 2004. (*Id.*) Dr. Kessel further stated that, at that time, plaintiff will be able to understand, remember, and carry out simple and detailed instructions, concentrate for extended time periods, relate to coworkers and supervisors, and adapt in a work environment. (*Id.*)

## F. ALJ's Decision

The ALJ applied the five-step analysis set forth in 20 C.F.R. § 416.920. He resolved step one in plaintiff's favor, as she did not perform substantial gainful activity since the onset of her alleged disability. (R. 13.) At step two, the ALJ found that plaintiff had a severe impairment of "major depressive disorder in remission, affective disorder." (R. 13-14.) The ALJ resolved step three against plaintiff, finding that her impairments did not meet or medically equal one of the impairments in Appendix 1 of 20 C.F.R. § 404.1520(d), namely, listings 12.04(A) and (B). (R. 14.)

The ALJ next analyzed plaintiff's residual functioning capacity ("RFC"). The ALJ found that plaintiff remained capable of performing "simple tasks." (R. 16.) In making this assessment, the ALJ found that plaintiff's testimony and statements "concerning the intensity, duration and limiting effects of [her] symptoms are not entirely credible" because of plaintiff's "noncompliance with medication and treatment prior to psychiatric hospital admissions." (R. 17.) The ALJ also gave "less weight" to plaintiff's subjective complaints because of her ability to travel alone to the hearing by train, perform activities of daily living without difficulty, cook and shop, and because she was enrolled in a return to work program three days per week. (*Id.*) The ALJ gave "considerable weight" to Ms. Warner's March 2003 letter to ACS where she advised, "[A]ny accommodation that can be made to reduce stress in the workplace and increase support would bolster [plaintiff's] recovery" and noted, "the 11 to 7 shift has these advantages." (*Id.*) The ALJ also gave "considerable weight" to Dr. Meadow's conclusion, based on his consultative examination on August 2, 2003, that plaintiff "would be able to function in a low pressured setting at this time." (*Id.*) In step four, the ALJ determined that plaintiff was unable to perform past relevant work as a child welfare specialist because it was stressful. (R. 18.) Finally, under step five,

10

the ALJ held that a significant number of jobs exist in the national economy that plaintiff could perform. (*Id.*) He found that, because plaintiff "has solely nonexertional limitations, the decision must be based on the principles in the appropriate sections of the regulations, giving consideration to any specific case situations described in the Medical-Vocational Rules (SSR 85-15)." (R. 19.) In turn, the ALJ concluded that plaintiff was capable of working in a "low stress environment." (*Id.*) The ALJ noted that plaintiff is "currently in a program designed to provide a return to substantial gainful activity" and that plaintiff should be "compliant with medication and treatment." (*Id.*) A vocational expert did not testify at the hearing.

### G. New Evidence Submitted to Appeals Council

Dr. Freeman, plaintiff's psychiatrist, completed a "Questionnaire for Psychiatric Disorders" report on October 14, 2005. (R. 860.) Plaintiff submitted this report to the Appeals Council after the ALJ denied her request for benefits. (R. 851.) Dr. Freeman diagnosed plaintiff with schizophrenia (paranoid type) and dependant personality disorder. (R. 860.) He noted that plaintiff continues to have symptoms of anxiety, hopelessness, sleep disturbance, feelings of helplessness, and depression with variable response to medication. (*Id.*) Dr. Freeman also stated that plaintiff experienced an increase in eating problems related to self-soothing. (*Id.*) Plaintiff was prescribed Lexapro, Wellbutrin, and Zyprexa. (R. 861.) According to Dr. Freeman, plaintiff also experienced marked limitation in concentration, social functioning, her ability to respond to co-workers and customary work pressures, and her ability to perform complex tasks on a sustained basis in a full-time work setting. (R. 862-64.) Moderate limitations were noted for plaintiff's ability to understand, remember and carry out directions, respond appropriately to supervision, and satisfy an employer's normal standards. (R. 184.) Additionally, Dr. Freeman found that plaintiff experienced

severe limitation in her ability to perform simple tasks on a sustained basis in a full-time work setting. (R. 864.)

In a separate report written on that date, Dr. Freeman also concluded that plaintiff's condition met criteria for mental disorder impairment sections 12.03A, 12.03B, and 12.03C listed in Appendix 1, subpart P of 20 C.F.R. § 404.1525.[6] (R. 865-67.) Dr. Freeman found that plaintiff satisfied section 12.03A because she had medically documented persistence, either continuous or intermittent, of illogical thinking associated with blunt affect and emotional withdrawal and/or isolation. (*Id.*) Plaintiff satisfied section 12.03B due to her marked difficulties in maintaining social functioning, concentration, persistence, or pace. (*Id.*) Section 12.03C was satisfied by plaintiff's medically documented history of a chronic schizophrenia, paranoid or other psychotic disorder of at least two years duration that has caused more than a minimal limitation of her ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support. (R. 866.) Additionally, Dr. Freeman determined that plaintiff satisfied the requirements of section 12.03C because she experienced repeated episodes of decompensation with each episode lasting for an extended duration. (*Id.*) Dr. Freeman believed that even a minimal increase in mental demands or change in environment would cause plaintiff to decompensate, and that plaintiff has a current history of inability to function outside of a highly supportive living arrangement for more than one year, with an indication of continued need for such an arrangement. (R. 866-67.)

---

6 Section 12.03 is titled "Schizophrenic, Paranoid, and Other Psychotic Disorders."

# DISCUSSION

## A. Standard of Review

Unsuccessful claimants for DIB under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court reviewing the final determination of the Commissioner must determine whether the ALJ applied the correct legal standards and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72,

83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

## B. Disability Claims

In order to receive DIB, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence that the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment" without reference to age, education, or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in

Appendix 1.[7]  *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five.  20 C.F.R. § 404.1520(e).  In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work."  20 C.F.R. § 404.1520(e).  Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience.  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(f).  At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work.  *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

### C. Application

The Commissioner moves to reverse and remand the ALJ's decision for further administrative proceedings, contending that the correct legal standards were not applied because the ALJ did not adequately evaluate some evidence from plaintiff's treating physicians and failed to develop the record by resolving certain inconsistencies from plaintiff's treating physicians. Plaintiff opposes the motion and cross-moves for reversal of the Commissioner's decision and remand solely for the calculation of benefits on the grounds that the ALJ and the Appeals Council committed legal errors, the record overwhelmingly establishes that plaintiff is disabled, and that, the Commissioner fails to present justification for remand for further proceedings.  The court agrees with the Commissioner and finds that remand for additional proceedings is warranted in this case.

---

[7] 20 C.F.R. pt. 404, subpt. P, app. 1.

### 1. Treating Physician Rule and Other Medical Sources

A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (*citing* 20 C.F.R. 404.1527(d)). The regulations define "acceptable medical sources" as (1) licensed physicians, (2) licensed or certified psychologists, (3) licensed optometrists, (4) licensed podiatrists, and (5) qualified speech-language pathologists. 20 C.F.R. 416.913(a). When a treating source's medical opinion is not given *controlling* weight, the proper weight accorded depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). Additionally, the ALJ must always "give good reasons" in her decision for the weight accorded to a treating source's medical opinion. *Id.* There are, however, certain decisions reserved to the Commissioner. Such decisions include the determination that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Opinions from medical sources that are not considered acceptable medical sources are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources

Who are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (Aug. 9, 2006); *see also Allen v. Astrue*, 05-CV-0101, 2008 WL 660510, at *9 (N.D.N.Y. Mar. 10, 2008) (remanding where the ALJ did not evaluate the treating therapist's opinion). Such sources include therapists and social workers. *Id.* Based on the particular facts of a case, such as length of treatment, it may be appropriate for an ALJ to give more weight to a non-acceptable medical source than a treating physician. *Id.* at *5.

Here, when the ALJ determined that plaintiff had the RFC to perform simple tasks, the ALJ did not give plaintiff's treating physicians "controlling weight" or give good reasons why he accorded their opinions the weight he did. The ALJ gave "considerable weight" to statements in a letter from Ms. Warner and information from a consultative examination form filled out by Dr. Meadow. (R. 17.) Generally, the opinion of a consultative physician, who only examined plaintiff once, should not be accorded the same weight as the opinion of plaintiff's treating psychotherapist. *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282-83 (E.D.N.Y. 2005) (holding that an ALJ gave too much weight to a one-time assessment by a consultative physician). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1992) (citation omitted).

When discussing plaintiff's RFC, the ALJ failed to mention Ms. Warner's August 18, 2003 treatment history report, Dr. Freeman's May 13, 2005 "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" report, or Dr. Chen's September 10, 2003 medical report. Each report discussed plaintiff's ability to function in the workplace. First, the ALJ must consider the evidence from all of plaintiff's treating physicians and either give their opinions controlling weight

or give good reasons why less than controlling weight is accorded. *Snell*, 177 F.3d at 134 (citing *Schaal*, 134 F.3d at 505) ("Failure to provide good reasons for not crediting the opinion of claimant's treating physician is a ground for remand."). Additionally, the ALJ must address all of the opinions from plaintiff's other treating sources, such as Ms. Warner. These failures amount to legal error. Accordingly, remand is warranted.

### 2. Pick and Choose Approach to Evaluating Evidence

Under 20 C.F.R. 404.1520(3), the ALJ must "consider all evidence" when determining whether a claimant is disabled. "It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004); *see also Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) ("Although we do not require that, in rejecting a claim of disability, an ALJ must reconcile explicitly every conflicting shred of medical testimony, we cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor.") (citations omitted).

Here, the ALJ employed a "pick and choose approach" to evaluate the evidence. For example, in support of his determination that plaintiff maintained the RFC to perform simple tasks, the ALJ selectively paraphrased a letter from Ms. Warner to ACS. (R. 16, 17.) Referring to the letter, the ALJ stated that Ms. Warner "opined that any accommodation that can be made to reduce stress in the workplace and increase support would bolster [plaintiff's] recovery and noted that the eleven to seven shift has these advantages." (R. 17.) The ALJ failed to disclose the remainder of the paragraph, which stated that such accommodations would "decrease the likelihood of further decompensation/or need for hospitalization." (R. 124.) The ALJ also failed to mention a portion of

18

the letter stating that plaintiff experienced "increased depressive symptoms which inhibit personal and professional functioning" and that her depression was characterized by "extreme tearfulness, feelings of overwhelm [sic], difficulty concentrating and organizing thoughts, fatigue, and a sense of hopelessness." (*Id.*)  This "pick and choose" approach to reviewing the evidence undermines the court's confidence in the ALJ's determination.  *See Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000) (finding that the inconsistent use of medical evidence undermines the ALJ's evaluation on the reliability of that evidence); *Ruggireo v. Astrue*, 05-CV-1179, 2008 WL 4518905, at *16 (W.D.N.Y. Sept. 30, 2008) ("The ALJ's selective reliance on only portions of Dr. Cunningham's opinions further undermines the RFC analysis."); *Watson v. Callahan*, 97 Civ 1398, 1997 WL 746455, at *13 (S.D.N.Y. Dec. 2, 1997) ("To allow the ALJ to rely on one portion of a doctor's report in support of his finding of no disability but then discount another portion of the very same report . . . would be inconsistent.").  In addition, the ALJ did not even mention Ms. Warner's August 18, 2003 treatment history report, which stated that plaintiff experienced difficulty concentrating when under stress or feeling overwhelmed and sustaining an ordinary workload and a reasonable pace.  (R. 120-21.)  The report also stated that, in a work setting, plaintiff had difficulty asserting herself, low self esteem and, as depression increased, had difficulty functioning in the workplace due to poor concentration and excessive fatigue.  (*Id.*)

The ALJ also relied on Dr. Meadow's consultative evaluation report dated August 2, 2003 and his conclusion that "claimant would be able to function in a low pressured setting at this time." The ALJ incorrectly stated that Dr. Meadow reached the same conclusion as plaintiff's treating sources.  (R. 17.)  None of plaintiff's treating sources explicitly stated that plaintiff could work in a low pressure setting.  In fact, they all expressed some doubt as to plaintiff's ability to perform in a

work setting. Additionally, Dr. Meadow's evaluation is undermined by the fact that plaintiff was hospitalized ten days after his evaluation and again in September 2003.

Finally, the ALJ cited Dr. Lindo's May 13, 2005 medical report, noting that the report "showed the claimant in stable condition and doing well." (R. 18.) The ALJ chose to rely on this statement from Dr. Lindo, a family practitioner who also assessed plaintiff's physical ailments, instead of Dr. Freeman's Medical Source Statement of Ability To Do Work-Related Activities (Mental) report from the same date. Dr. Freeman's report stated, among other things, that plaintiff's ability to respond appropriately to supervision, co-workers, work pressures, and changes in a routine work setting were moderately affected by her impairment. (R. 171.) Such a review of the evidence in plaintiff's case was improper. Accordingly, on remand, the ALJ is directed to consider whether plaintiff is disabled in light of all of the evidence contained in the record.

### 3. The Assessment of Plaintiff's Credibility

In determining a plaintiff's credibility, an ALJ, based on all of the evidence in the case record, may "find all, only some, or none of an individual's allegations to be credible." SSR 96-7p, Evaluation of Symptoms in Disability Claims, 1996 WL 374186, at *4 (July 2, 1996). The "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *2. In addition, the ALJ "must make every reasonable effort to obtain available information that could shed light on the credibility" of a plaintiff. *Id.* at *3; *see also Cloutier v. Apfel*, 70 F. Supp. 2d 271, 278 (W.D.N.Y. 1999) (remanding where the ALJ failed to resolve inconsistencies when determining plaintiff's credibility).

In this case, the ALJ found that plaintiff's testimony and allegations were "not entirely credible because she has shown noncompliance with medication and treatment prior to psychiatric hospital admissions." (R. 17.) To support this conclusion, the ALJ cited two discharge reports from plaintiff's hospitalizations. The first report, dated June 5, 1998, stated that plaintiff had not been compliant with medication. (R. 111.) The second report, dated September 11, 2003, stated that plaintiff "agreed to be compliant with medications." (R. 17, 302.) In light of the voluminous amount of records by plaintiff's treating physicians and the various reports from plaintiff's numerous hospitalizations, the ALJ placed too much weight on these two discharge reports.

First, the 1998 report was completed approximately five years before the alleged disability onset date. Second, the 2003 report does not explicitly state that plaintiff had not been compliant with medication. Instead, it says that plaintiff "agreed to be compliant with medications." (R. 302.) The record indicates that plaintiff was admitted to a hospital for psychiatric issues on five occasions in addition to the two instances mentioned by the ALJ. Doctors did not report plaintiff's non-compliance with medication in connection with those other hospitalizations. Finally, none of plaintiff's treating sources including Ms. Warner, Dr. Freeman, or Dr. Chen indicated that plaintiff was non-compliant with medication. If the ALJ suspected that compliance with medication could have been relevant to the determination of whether plaintiff was disabled, he should have made a "reasonable effort" to obtain additional information regarding plaintiff's compliance with medication from plaintiff's treating physicians or from plaintiff herself. ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). The ALJ did not seek additional information from plaintiff's treating physicians or question plaintiff on this subject

during the hearing.  The evidence before the court does not support this lack of credibility finding and further effort needs to be made to develop the record in this regard.

The ALJ also gave "less weight" to plaintiff's subjective complaints because, among other things, she is currently enrolled in a "return to work program, attending three days a week." (R. 17.) This conclusion is also unsupported by the record.  The "return to work program," referred to by the ALJ, is a vocational training and recovery program for mental health clients where, at the time of the hearing, plaintiff was interning as a receptionist to see how she would cope with working in a real employment setting.  (R. 769, 894-96.)  The evidence concerning plaintiff's involvement with this program does not support the ALJ's conclusion that, because plaintiff was involved in the program, she should be able to perform a low-stress job.  In fact, the evidence supports the opposite conclusion—that plaintiff is not capable of working.  Ms. Hoskins, the employment specialist in charge of plaintiff at the program, stated that plaintiff's focus in the program changed from searching for employment to treating her mental illness because plaintiff was "extremely depressed and, as a result, was almost completely non functional." (R. 769.)  Ms. Hoskins also stated that, in her opinion, plaintiff "is incapable of performing any substantial gainful employment" and that plaintiff's "expectation of holding a steady job are unrealistic and any new employment will probably lead to another episode of decompensation." (769-70.)  Plaintiff's internship experience was expected to last a maximum of two weeks and was a sheltered, non-competitive work environment, designed to allow plaintiff to take lessons learned in the program and apply them in a real employment setting.  (R. 770.)  A letter from Ms. Hoskins to the Appeals Council confirms her position and also states that plaintiff is "unable to perform competitive employment despite her strong desire to do so." (R. 876.)  Accordingly, it was legal error for the ALJ to discount plaintiff's

22

complaints based on conclusions that are unsupported by the record. *See Goldthrite v. Astrue*, 535 F. Supp. 2d 329, 339 (W.D.N.Y. Feb. 12, 2008) (ALJ's reasons for questioning plaintiff's credibility were not supported by the record); *McVey v. Shalala*, 92-CV-127, 1994 WL 764194, at *8 (E.D.N.Y. Oct. 19, 1994).

### 4.  New Evidence Before the Appeals Council

Under the Act, a claimant may "submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision."  20 C.F.R. §§ 404.970 and 416.1470; *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  "If the new evidence relates to a period before the ALJ's decision, the Appeals Council shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.*  To obtain a review of such evidence, the claimant must show that "the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007) (citing *Lisa v. Sec'y of Health & Human Servs*. 940 F.2d 40, 43 (2d Cir. 1991)).  Materiality means "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Id.*  When the Appeals Council fails to consider such evidence, "the proper course of the reviewing court is to remand the case for reconsideration in light of the new evidence." *Shrack v. Astrue*, 08-CV-168, 2009 WL 712362, at *3 (D. Conn. Apr. 1, 2009). Furthermore, where newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must give good reasons for

23

the weight accorded to a treating source's medical opinion. *Id*. (citing *Snell*, 177 F.3d at 34); *see also Farina v. Barnhart*, No. 04-CV-1299 (JG), 2005 WL 91308, at *5 (E.D.N.Y. Jan. 18, 2005) (remanding for further proceedings where the Appeals Council failed to acknowledge receipt of new evidence from claimant's treating physician and failed to "provide the type of explanation required under the treating physician rule" when denying review).

In this case, after the ALJ denied benefits, plaintiff submitted a "Questionnaire For Psychiatric Disorders" report to the Appeals Council filled out by plaintiff's treating psychiatrist, Dr. Freeman, on October 14, 2005. The Appeals Council acknowledged its receipt of Dr. Freeman's report, but did not comment on it when denying plaintiff's request for review. (R. 4-7.) As the report from plaintiff's treating psychiatrist was new and material evidence, failure to consider it was improper and provides sufficient cause for remand.

In his October 14, 2005 report, Dr. Freeman diagnosed plaintiff with schizophrenia (paranoid type) and dependant personality disorder. (R. 860.) He noted that plaintiff continues to have symptoms of anxiety, hopelessness, sleep disturbance, feelings of helplessness and depression with variable response to medication. (*Id.*) Dr. Freeman also commented that plaintiff has experienced an increase in eating problems related to self-soothing. (*Id.*) Plaintiff was prescribed Lexapro, Welbutrin and Zyprexa. (R. 861.) Plaintiff also experienced marked limitation in concentration, social functioning, her ability to perform complex tasks on a sustained basis in a full-time work setting, and respond to co-workers and customary work pressures. (R. 862-64.) Moderate limitations were noted for plaintiff's ability to understand, remember and carry out directions, respond appropriately to supervision, and satisfy an employer's normal standards. (R. 184.) Additionally, Dr. Freeman found that plaintiff had severe limitation in her ability to perform

simple tasks on a sustained basis in a full-time work setting. (R. 864.)

Dr. Freeman also completed a report entitled "Supplement to Psychiatric Disorders Questionnaire" which established that, in his opinion, plaintiff's condition met criteria for mental disorder impairment listing sections 12.03A, 12.03B, and 12.03C. *See* Appendix 1, subpart P of 20 C.F.R. § 404.1525. (R. 865-67.) Section 12.03 is titled "Schizophrenic, Paranoid, and Other Psychotic Disorders." (R. 865.) In the report, Dr. Freeman found that plaintiff satisfied the requirements of section 12.03A because she had medically documented persistence, either continuous or intermittent, of illogical thinking associated with blunt affect and emotional withdrawal and/or isolation. (*Id.*) According to Dr. Freeman, plaintiff satisfied the requirements of section 12.03B because she experienced marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (*Id.*) Finally, Dr. Freeman believed that plaintiff's condition satisfied the requirements of section 12.03C because plaintiff had a medically documented history of chronic schizophrenia, paranoid or other psychotic disorder lasting at least two years in duration that has caused more than a minimal limitation of her ability to perform basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support. (R. 866.) Dr. Freeman also stated that plaintiff experienced repeated episodes of decompensation with each episode lasting for an extended duration, and that even a minimal increase in mental demands or change in plaintiff's environment would cause her to decompensate. (*Id.*) Finally, Dr. Freeman noted that plaintiff had a current history of inability to function outside of a highly supporting living arrangement for more than one year, with indication of a continued need for such an arrangement. (R. 866-67.)

Some of this information, particularly Dr. Freeman's supplemental report outlining

plaintiff's fulfillment of listing section 12.03, is new information. Plaintiff's other treating physicians did not directly address the issue of whether plaintiff's condition met or equaled an impairment listed in section 12.03. Further, the ALJ only considered whether plaintiff's condition met or equaled an impairment in section 12.04. These reports are material because they are relevant to plaintiff's psychological condition during the time period for which benefits were denied and probative of the severity of plaintiff's psychiatric illness. The reports relate to ongoing and regular treatment of plaintiff's mental illness by Dr. Freeman, which began before the ALJ rendered his decision. Thus, the reports concern the period on or before the ALJ's decision. *See Boyd v. Apfel*, No. 97-CV-7273, 1999 WL 1129055, at *5 (E.D.N.Y. Oct. 15, 1999) (finding that a report submitted to the Appeals Council summarizing the findings of an examination that occurred after the administrative hearing concluded was new evidence because it concerned the treatment of plaintiff's ongoing medical condition). The court further concludes that there is a reasonable possibility, especially in light of the finding by a treating physician that plaintiff's condition meets the requirements of listing section 12.03, that the ALJ may reach a different conclusion in light of the report from Dr. Freeman. *Lisa*, 940 F.2d at 43-46 (remanding to the Secretary when new diagnostic evidence would present a reasonable possibility of influencing the Secretary to decide her application differently); *see also Tolany v. Heckler*, 756 F.2d 268, 272 (2d Cir. 1985) (finding new evidence of the seriousness of claimant's condition material).

The October 14, 2005 report from Dr. Freeman is also inconsistent with the report he completed on May 13, 2005. The Appeals Council, like the ALJ, has an affirmative duty to develop the record. *Boyd v. Apfel*, No. 97-CV-7273, 1999 WL 1129055, at *5 (E.D.N.Y. Oct. 15, 1999) (remanding for further proceedings because the Appeals Council did not seek out clarifying

information concerning a report by plaintiff's treating physician); *see also Joe v. Apfel*, No. 97-CV-772, 1998 WL 683771 at \*5 (W.D.N.Y. 1998) (remanding where the "Commissioner erred in failing to develop the record at the Appeals Council level of review").  In his May 2005 report, Dr. Freeman noted that plaintiff had no limitation in her ability to understand, remember, and carry out instructions, and therefore, no limitation in her ability carry out short, simple instructions.  In the October 2005 report, however, Dr. Freeman stated that plaintiff has severe limitation in her ability to perform simple tasks on a sustained basis and moderate limitation in her ability to understand, remember, and carry out instructions.  Additionally, in the October 2005 report, Dr. Freeman found that plaintiff experienced marked limitation in her ability to respond to co-workers and customary work pressures, while in the May 2005 report he stated that plaintiff had only moderate limitations in those areas.  The Appeals Council had a duty to resolve these inconsistencies.  As Dr. Freeman's report was new and material and was inconsistent with his earlier report, the Appeals Council's failure to affirmatively address it is sufficient cause for remand.

### D.  Remand to the Commissioner for Further Administrative Proceedings

This court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  It is proper to remand for further administrative proceedings when the ALJ has not applied the correct legal standards or when the administrative record contains gaps so that further development of the evidence would assure a proper disposition of plaintiff's claim.  *Rosa*, 168 F.3d at 82-83; *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Remand solely for the calculation of benefits is appropriate when the record contains persuasive proof of disability such that remand for further evidentiary proceedings would

serve no purpose. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *see also Hopper v. Commissioner of Social Sec.* No. 06-CV-0038, 2008 WL 724228, at *13 (N.D.N.Y. Mar. 17, 2008) (Remand for further administrative proceedings is appropriate because there is "no incontrovertible proof of disability."); *Schaal*, 134 F.3d at 504 (remanding for further administrative proceedings when it was unclear that correct legal principles could lead to "only one conclusion.").

As discussed, the ALJ made several legal errors in this case. However, the court is not convinced that consideration of all the evidence only leads to one conclusion—that plaintiff is disabled. Remand would serve a number of purposes in this case, namely, whether plaintiff is capable of working in a low-stress environment. Plaintiff's treating physicians contradict each other regarding her limitations in the workplace. For example, Dr. Chen stated that plaintiff's ability to respond appropriately to changes in the work setting, socially interact at the workplace, and perform work related mental activities, were unlimited, though he also noted that plaintiff may have trouble concentrating for a long time when under stress or anxiety. (R. 131-32.) Dr. Freeman, on the other hand, stated that plaintiff has marked limitation in concentration, social functioning, her ability to respond to co-workers and customary work pressures, and her ability to perform complex tasks on a sustained basis in a full-time work setting. (R. 862-64.) He also opined that plaintiff experienced severe limitation in her ability to perform simple tasks on a sustained basis in a full-time work setting. (R. 864.) With regard to other sources of information concerning plaintiff's ability to work, Ms. Warner requested that plaintiff's last place of employment accommodate a shift change to reduce plaintiff's stress level. (R. 124.) Ms. Hoskins, the employment specialist at netWORK Plus, stated that plaintiff "has had a pattern of undertaking more than her limitations allow, and then becoming overwhelmed and decompensated." (R. 876.)

28

As these statements focus on plaintiff's likelihood to decompensate when under stress or attempting to undertake more than her capabilities allow, they do not compel a conclusion that plaintiff is completely incapable of working.

Further, the October 2005 report by Dr. Freeman, which plaintiff submitted to the Appeals Council, is inconsistent with his previous report from the same year. This inconsistency must be resolved. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). Accordingly, the court finds that plaintiff's case must be remanded for further administrative proceedings.

On remand, the ALJ is directed to do the following: 1) address the medical opinions by plaintiff's treating physicians and accord them controlling weight or provide good reasons for according those opinions less than controlling weight; 2) address the opinions of plaintiff's other medical sources; 3) revaluate the credibility of plaintiff's testimony in light of the entire administrative record, seeking further information where necessary; and 4) consider the new evidence from Dr. Freeman to the extent that it is material, not cumulative, and relates to the period on or before the date of the ALJ's decision, in light of the evidence already contained in the administrative record. The ALJ is further directed to articulate good reasons for the weight accorded to Dr. Freeman's new medical opinion and develop the record to clarify inconsistent findings by the same treating physician or between the various treating physicians.

**E. New ALJ**

In light of the legal errors outlined above and the cursory manner in which the ALJ examined the medical evidence and opinions of plaintiff's treating sources, plaintiff's case must be assigned to a different ALJ on remand. *See Falco v. Astrue*, 07-CV-1432, 2008 WL 4164108, at *8

(E.D.N.Y. Sept. 5, 2008) (reassigning plaintiff's case on remand where the original ALJ failed to outline the weight given to treating physicians' opinions); *Memoli v. Califano*, 463 F. Supp. 578, 584 (S.D.N.Y. 1978) (reassigning plaintiff's case on remand where the original ALJ did not seek necessary medical evidence).

## CONCLUSION

For the reasons set forth above, the Commissioner's motion to reverse and remand for further administrative proceedings is granted.  Plaintiff's cross-motion for judgment on the pleadings and to reverse and remand solely for the calculation of benefits is denied.


SO ORDERED

DATED:        Brooklyn, New York
              August 28, 2009

                                        _____/s/_____
                                            DORA L. IRIZARRY
                                          United States District Judge